IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**


NAUTILUS INS. CO. V. CHERAN INVESTMENTS


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


NAUTILUS INSURANCE COMPANY, APPELLEE,

V.

CHERAN INVESTMENTS LLC, ET AL., APPELLEES, AND BLASINI INC. AND
RICHARD BRUNO, DOING BUSINESS AS BRUNO INVESTMENTS, APPELLANTS.


Filed January 28, 2014.    No. A-13-022.


Appeal from the District Court for Douglas County: JOSEPH S. TROIA, Judge. Reversed and remanded for further procedings.

Ryan J. Lewis and Gregory Lake, of Lewis, Pfanstiel & Reed, L.L.C., for appellants.

Craig A. Knickrehm and Jonathan M. Brown, of Walentine, O'Toole, McQuillan & Gordon, L.L.P., for appellee Pinnacle Bank.


IRWIN, PIRTLE, and BISHOP, Judges.

BISHOP, Judge.

Nautilus Insurance Company (Nautilus) provided commercial property insurance to Blasini Inc. (Blasini), doing business as the Attic Bar & Grill, a bar and restaurant located in Omaha, Nebraska. Following a fire at the bar in March 2011, Nautilus filed an interpleader action against several defendants to determine who was entitled to insurance proceeds for (1) the building damage and (2) the personal property damage. Blasini claimed entitlement to the personal property damage proceeds, because it was the owner of the damaged personal property and was also the named insured under the policy with Nautilus. Richard Bruno, doing business as Bruno Investments (Bruno), also claimed ownership of the personal property. However, Dr. Nirmal Raj, managing member of Cheran Investments LLC (Cheran Investments), claimed he owned the personal property because Blasini and/or Bruno had failed to pay the purchase price to him under a purchase agreement to buy the business' assets.

- 1 -

Pinnacle Bank (Pinnacle) claimed entitlement to the insurance proceeds because of two security agreements securing a loan to Cheran Investments. Pinnacle initially secured its loan to Cheran Investments by a deed of trust for the real property and a security agreement related to affixed or attached goods at the subject real estate.

Michael Perkins, doing business as Perkins & Perkins Co. (Perkins), claimed entitlement to a portion of the insurance proceeds pursuant to a construction lien previously filed on the real property.

In January 2012, the court granted partial summary judgment in favor of Pinnacle for the insurance proceeds stemming from the damage to the building. No party appealed this decision of the court. In December, the district court granted summary judgment in favor of Pinnacle for the insurance proceeds stemming from the damage to the business' personal property as well. The district court concluded that "due to Blasini and Bruno's failure to consummate the purchase agreement" with Cheran Investments, Cheran Investments was the owner of the personal property damaged by the fire. Because Cheran Investments acknowledged Pinnacle's security interest in Cheran Investments' personal property, and per Cheran Investments' consent, the district court awarded $96,774.10 in personal property insurance proceeds to Pinnacle. Blasini and Bruno appealed this order of the court. We reverse, and remand for further proceedings.

BACKGROUND

On November 12, 2008, Cheran Investments leased the premises located at "3231-3229 Harney Street, Omaha, Nebraska," to Blasini for the purpose of operating the Attic Bar & Grill. The rental agreement was for a term of 5 years and provided that Blasini was to pay monthly rent to Cheran Investments commencing February 1, 2009. Blasini was also responsible for payment of property taxes. In 2011, in a separate action brought by Cheran Investments against Blasini in county court, the court found that Blasini was in arrears on its payment of rent, taxes, and late fees from June 2010 through July 2011. Apparently, Blasini appealed this county court decision to the district court, but resolution of that appeal, if any, is not in our record.

Blasini entered into a "Purchase Agreement," dated the same day as the rental agreement, with Dr. Raj and his wife, doing business as Chola, Inc., to purchase the "business assets" of the bar owned by the couple. The business assets of the bar that Blasini agreed to purchase under the agreement included "the furniture, Security systems, Aloha accounting system, Television, Music system, refrigerators, kitchen equipment, [and] food and liquor inventory." A handwritten ledger attached to the agreement lists the business assets and their values, totaling $150,000.

The purchase agreement refers to Blasini as the future manager at the Attic Bar & Grill, provides that Blasini will assume the liquor license, and states that "all liability in running the business will be the responsibility of the new owner, while the license is in transition." The agreement concludes: "The seller will assist in allowing for a smooth transition in ownership." The terms of the agreement called for Blasini to pay $50,000 in the first year and the remaining $100,000 over the subsequent 24 months. Dr. Raj testified in an affidavit that Blasini and/or Bruno failed to pay the purchase price of $150,000.

On December 8, 2010, Cheran Investments executed a promissory note to Pinnacle in the original principal amount of $379,229.23. The promissory note was secured by a deed of trust conveying Cheran Investments' interest in the real property at 3229 Harney Street to Pinnacle as

collateral and by a security agreement granting Pinnacle a security interest in "all goods now or in the future affixed or attached to real estate" at the Harney Street property. Both the deed of trust and security agreement were dated December 7, 2007. Pinnacle filed a "UCC Financing Statement" on December 31.

On March 28, 2011, a fire damaged the building and personal property at the Attic Bar & Grill. Subsequent to the fire, on April 11, Cheran Investments provided additional security to Pinnacle to secure the December 8, 2010, promissory note, granting Pinnacle a security interest in all of Cheran Investments' business assets, including equipment, inventory, accounts and other rights to payments, furniture and fixtures, deposit accounts, investment property, instruments, and chattel. Pinnacle filed a "UCC Financing Statement" on April 11.

Nautilus filed an amended complaint in interpleader on July 8, 2011, against Cheran Investments, Pinnacle, Perkins, Blasini, and Bruno, all of whom claimed an interest in the insurance proceeds payable as a result of fire damage to the Attic Bar & Grill. Nautilus recognized that as provider of building property coverage for the subject property, it owed payment under the insurance policy in the amounts of (1) $70,929.93 for damage to the building and (2) $96,774.10 for damage to the business' personal property. The district court permitted Nautilus to deposit $167,704.03 with the court and dismissed it from the action.

On January 4, 2012, the court granted partial summary judgment in favor of Pinnacle, finding it was entitled to $70,929.93 in insurance proceeds for the damage to the building, and that determination is not at issue in this appeal. On December 10, the district court granted summary judgment in favor of Pinnacle, finding it was also entitled to the insurance proceeds for damage to the business' personal property, and awarded it $96,774.10. Blasini and Bruno timely appealed.

## ASSIGNMENT OF ERROR

Blasini and Bruno assert on appeal that the district court erred in granting Pinnacle's motion for summary judgment on the basis that they failed to consummate the purchase agreement.

## STANDARD OF REVIEW

An appellate court will affirm a lower court's grant of summary judgment if the pleadings and admitted evidence show that there is no genuine issue as to any material facts or as to the ultimate inferences that may be drawn from the facts and that the moving party is entitled to judgment as a matter of law. *Shada v. Farmers Ins. Exch.*, 286 Neb. 444, ___ N.W.2d ___ (2013).

In reviewing a summary judgment, an appellate court views the evidence in a light most favorable to the party against whom the judgment was granted and gives that party the benefit of all reasonable inferences deducible from the evidence. *Guinn v. Murray*, 286 Neb. 584, 837 N.W.2d 805 (2013).

ANALYSIS

*Ownership of Personal Property.*

The primary issue we must resolve on this appeal is the legal effect of the purchase agreement entered into between Dr. Raj on behalf of Chola and Blasini on November 12, 2008. The trial court found that "due to Blasini and Bruno's failure to consummate the purchase agreement, Cheran Investments is the owner of the property, including the assets. The Court further finds that per Cheran's consent, the proceeds should be applied to its loan at Pinnacle . . . ." Initially, we note that the trial court and the parties refer to Bruno and Blasini interchangeably; however, in the record before us, there is no evidence regarding the relationship between Bruno and Blasini other than an affidavit by Dr. Raj (attached to an answer filed by Cheran Investments), wherein he states that 2 days after the fire, "Richard Bruno, identified at earlier hearing in this matter as the manager of the Defendant BLASINI, INC.," removed personal property from the premises with the help of 12 other individuals. Our record reflects that the president of Blasini entered into the rental agreement and purchase agreement on behalf of Blasini. Further, Blasini was apparently the named insured on the insurance policy with Nautilus, although we note a copy of the policy is not in our record. Accordingly, our references will be made primarily with regard to Blasini.

To create a contract, there must be both an offer and an acceptance; there must also be a meeting of the minds or a binding mutual understanding between the parties to the contract. *City of Scottsbluff v. Waste Connections of Neb.*, 282 Neb. 848, 809 N.W.2d 725 (2011). A contract is not formed if the parties contemplate that something remains to be done to establish contractual arrangements or if elements are left for future arrangement. *Id.*

The interpretation of a contract involves a question of law, in connection with which an appellate court has an obligation to reach its conclusions independently of the determinations made by the court below. *Pavers, Inc. v. Board of Regents*, 276 Neb. 559, 755 N.W.2d 400 (2008). The meaning of a contract and whether a contract is ambiguous are questions of law. *Id.* When the terms of a contract are clear, they are to be accorded their plain and ordinary meaning. *Katherine R. Napleton Trust v. Vatterott Ed. Ctrs.*, 275 Neb. 182, 745 N.W.2d 325 (2008).

No party disputes that Dr. Raj and Blasini signed and executed a "Purchase Agreement" on November 12, 2008, under which Blasini agreed to purchase the business assets of the bar for $150,000. The agreement provided the items of the bar that Blasini was purchasing, the value of the items, and when Blasini's payment became due. According to the purchase agreement, Dr. Raj and his wife, as current owners of the business, "agree[d] to the terms of this agreement" and agreed to assist in the smooth transition in ownership to Blasini. The terms of the agreement are clear that the parties intended to enter into a contract at the time this agreement was executed.

Pinnacle asserts that "Blasini seeks a determination of ownership based on nothing more than an executed agreement to purchase business personal property, supplemented with no evidence whatsoever of performance, compliance, or consummation of the terms and conditions of the contract." Brief for appellee Pinnacle at 7. As noted by Pinnacle, Blasini and Dr. Raj *executed* a purchase agreement, and the terms of the purchase agreement contain no conditions precedent to performance by either party. See *Cimino v. FirsTier Bank*, 247 Neb. 797, 530 N.W.2d 606 (1995) (condition precedent is condition which must be performed before parties'

- 4 -

agreement becomes binding contract or condition which must be fulfilled before duty to perform existing contract arises). Rather, whether Blasini performed or complied with the terms of the contract speaks to whether Blasini breached the contract. A "breach" is a nonperformance of a duty. *Phipps v. Skyview Farms*, 259 Neb. 492, 610 N.W.2d 723 (2000).

We next consider the effect of the executed purchase agreement on ownership of the bar's assets. If Blasini acquired ownership of the bar's personal property on November 12, 2008, upon execution of the purchase agreement, Dr. Raj had no ownership interest in the same personal property in which he could properly grant Pinnacle a security interest on April 11, 2011. See Neb. U.C.C § 9-203(b)(2) (Cum. Supp. 2012) (security interest is enforceable against debtor and third parties with respect to collateral only if debtor has rights in collateral or power to transfer rights in collateral to secured party).

Nebraska's Uniform Commercial Code (U.C.C.) applies to transactions in goods. Neb. U.C.C. § 2-102 (Reissue 2001). The U.C.C. defines goods as "all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale other than the money in which the price is to be paid, investment securities (article 8) and things in action." Neb. U.C.C. § 2-105 (Reissue 2001). If a transaction is not for the sale of goods, the provisions of the U.C.C. do not apply to that transaction. *MBH, Inc. v. John Otte Oil & Propane*, 15 Neb. App. 341, 727 N.W.2d 238 (2007). Whether goods or nongoods predominate a contract is generally a question of law. *Id.*

In *Southwest Bank of Omaha v. Moritz*, 203 Neb. 45, 277 N.W.2d 430 (1979), the Nebraska Supreme Court applied U.C.C. provisions to analyze when ownership transferred under a contract to sell the assets of a sole proprietorship of a hardware store to a corporation. The assets sold included fixtures and inventory located in the store. See, also, *Hammond v. Streeter*, 225 Neb. 491, 406 N.W.2d 633 (1987) (applying U.C.C. provisions to contract for sale of business involving mixed sale of goods and nongoods because both parties argued contract fell under U.C.C.). Cf. *MBH, Inc. v. John Otte Oil & Propane, supra* (concluding U.C.C. did not apply to sales contract of ongoing business because essential elements of contract were for nongoods, including real estate, buildings, and goodwill).

We conclude the provisions of the U.C.C. apply to the instant purchase agreement. The purpose of the agreement was for Blasini to purchase the business assets of the bar, all of which were things movable at the time of the contract. The items specifically designated in the agreement were "the furniture, Security systems, Aloha accounting system, Television, Music system, refrigerators, kitchen equipment, [and] food and liquor inventory." The ledger attached to the agreement lists several of the bar's items and their values, including "kitchen equipment," "ice machine," "ATM," "snake," "speakers," "cutlery," and "furniture." The entire purchase price of $150,000 accounted for movable items of the bar, and no real estate, intellectual property, or goodwill was transferred under the purchase agreement.

Under the U.C.C., unless otherwise explicitly agreed where delivery is to be made without moving the goods, if the goods are at the time of contracting already identified and no documents are to be delivered, title passes at the time and place of contracting. Neb. U.C.C. § 2-401(3)(b) (Cum. Supp. 2012). This section does not provide for a revesting of title for nonpayment of purchase price alone, unless the contract of sale so provides. *Maryott v. Oconto Cattle Co.*, 259 Neb. 41, 607 N.W.2d 820 (2000).

We find *Southwest Bank of Omaha v. Moritz, supra*, instructive to the instant case. In that case, both a bank and a trustee in bankruptcy claimed an interest in the fixtures and inventory of a hardware store. The bank had acquired a security interest in the fixtures and inventory of the hardware store owned by a sole proprietor. After the bank acquired this security interest, the sole proprietor took the steps necessary to create a corporation and transferred the assets of the sole proprietorship to the corporation. Because the court found the bank failed to perfect its security interest, the court needed to resolve the question: "[D]id [the owner] sell the assets of the sole proprietorship to the corporation?" *Id.* at 54, 277 N.W.2d at 436. If the title to the fixtures and inventory transferred to the corporation, the trustee would take the fixtures and inventory free from the bank's security interest. Applying the U.C.C., the court found:

> The essential facts are that [the owner] and the corporation did contract, as evidenced by the corporate minutes and his acceptance of the stock certificate. At that time the goods were identified and they consisted of the fixtures and inventory then located in the store . . . . No physical delivery needed to be made. . . . The contract did not contemplate the delivery of any document of title. Title passed under the provisions of section 2-401(3)(b) . . . at the time of contracting.

*Southwest Bank of Omaha v. Moritz*, 203 Neb. 45, 55, 277 N.W.2d 430, 436 (1979).

In the present case, the evidence is that Dr. Raj and Blasini contracted to transfer the business assets of the bar, evidenced by the signed purchase agreement. No physical delivery needed to be made because Blasini was to assume operation of the bar in which the goods were located. Under § 2-401, therefore, "title" to the goods passed to Blasini at the time of contracting. The purchase agreement made no provision for when title passed to Blasini. Therefore, irrespective of whether Blasini paid the purchase price to Dr. Raj, Blasini became the owner of the property in the purchase agreement.

Because we conclude that Dr. Raj did not retain ownership of the personal property at issue, he could not have granted Pinnacle a security interest on April 11, 2011, in the personal property previously sold to Blasini. See § 9-203(b)(2). The trial court erred in concluding that Dr. Raj was the owner of the personal property. Although we conclude that Blasini was the owner of the personal property at the time of the fire, the analysis of who is entitled to the proceeds does not end there.

As noted previously, the April 11, 2011, security agreement between Pinnacle and Dr. Raj also included as security all rights Dr. Raj had to present or future payments "including, but not limited to, payment for property or services sold, leased, [or] rented . . . . This includes any rights and interests . . . which [Dr. Raj] may have by law or agreement against any Account Debtor or obligor . . . ." Accordingly, to the extent Dr. Raj was entitled to payments from Blasini on the contract, Pinnacle, under the terms of the security agreement, had the authority to enforce obligations owed under the contract. In Pinnacle's cross-claim against all the defendants, it asserts that because of its perfected security interest in any and all sums owed by Blasini to Dr. Raj, Pinnacle should receive the insurance proceeds.

*Interpleader.*

> Interpleader is an equitable proceeding for determination of adverse claims by rival claimants to the same property or fund held by a third person as a stakeholder. . . .

- 6 -

Interpleader is based on the theory that adverse claimants should litigate between or among themselves their conflicting rights or claims to property or a fund, without involving the stakeholder who, disclaiming any interest in the property or fund, has, in good faith, offered to deliver, or has delivered, the property to a court or has deposited the money in the court's registry. . . .

The function or purpose of interpleader is to protect a disinterested person, as a stakeholder, against conflicting claims to property or a fund and to avoid the stakeholder's exposure to multiple liability or a multiplicity of suits.

*Ehlers v. Perry*, 242 Neb. 208, 210, 494 N.W.2d 325, 328-29 (1993) (citations omitted).

In this case, Nautilus paid $96,774.10 in to the court for its determination of the various conflicting claims for the insurance money for personal property lost or damaged in the fire. Therefore, in this equitable proceeding to determine "adverse claims by rival claimants to the same property," *id.*, the trial court was tasked with determining the merits of the various underlying claims to that insurance money. To the extent the evidence establishes that Blasini and/or Bruno are obligated to Dr. Raj for amounts due under the purchase agreement for the personal property at issue as Dr. Raj and Pinnacle claim, the trial court could direct that the insurance proceeds be paid over to Pinnacle due to its security interest in such proceeds and Dr. Raj's agreement that such proceeds be paid over to Pinnacle to be applied to his loan. However, the trial court did not reach that determination in its summary judgment order. Rather, the trial court held instead that Pinnacle was entitled to the personal property insurance proceeds because Blasini and Bruno failed to "consummate the purchase agreement." The court made no specific findings regarding a breach of contract or what, if any, payments were made by Blasini and/or Bruno to Dr. Raj. Accordingly, this matter cannot be decided on the record before us and must be remanded for further proceedings.

## CONCLUSION

We conclude that the trial court erred in granting summary judgment in favor of Pinnacle as a matter of law on the record before us. We reverse and remand for further proceedings consistent with the above analysis.

REVERSED AND REMANDED FOR
FURTHER PROCEEDINGS.